

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00260-CV

———————————————

DEAN PARK, Appellant

V.

ZIAD ABOUDAIL, Appellee

---

On Appeal from County Court at Law No. 2
Tarrant County, Texas
Trial Court No. 2013-004938-2

---

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant Dean Park appeals a taking-nothing judgment from a non-jury trial with Appellee Ziad Aboudail[1] involving a dispute related to payment for automobile repairs and construction work. In two issues, Park contends that the trial court erred (1) in granting a take-nothing judgment because it "was against the great weight and preponderance of the evidence" and (2) in failing to extend deadlines under Texas Rule of Civil Procedure 306a. We disagree and affirm.

### II. BACKGROUND

#### A. The Agreement

Aboudail is the owner of an automotive repair shop who also buys and sells vehicles. According to Aboudail, he met Park, who is in the construction business, at a Fort Worth automobile auction and "established a friendship relationship" with him wherein Aboudail agreed to repair some of Park's cars. Instead of being paid for the repairs, Aboudail explained that he reached an agreement with Park where they would exchange services with one another. Specifically, when Park brought the first vehicle to Aboudail to be repaired, Aboudail was also having issues with the City of Fort Worth that were "stressing [him] out" regarding a firewall and carport in the back of

---

[1]Appellee's name is spelled "Aboudail" throughout the clerk's and reporter's records. However, both Appellant and Appellee spell it "Abudail" at times in their briefs. They have offered no explanation for the discrepancy. Consistent with the style and judgment in the trial court, we spell it "Aboudail" in this opinion.

his automotive repair shop.  By Aboudail's account, after telling Park the issues he was facing,

> He said -- we suggested -- it actually came from both of us -- how about if you work on my cars for no charge for the labor.  I buy the parts, and then I'm going to take care of this issue for you with the City and you just pay the expenses, which is the material, and anything, you know, out of pocket.  I said, that's no problem.  So we agreed on trade and labor for no matter how many cars he got or he bring to work on.

Aboudail believed "our agreement is friendly agreement that there's no charge for the labor he does for me and no charge for me -- labor I do for him."  In Aboudail's words, it was a bartering or "service for service" agreement.

Park disagrees with Aboudail's account of their meeting and agreement.  According to Park, he first met Aboudail when he went to look at purchasing Aboudail's maintenance shop, building, and business.  While looking at Aboudail's property, Park remembers that Aboudail "just kind of volunteered" to fix his first car.  After he repaired it, Park "did not pay him for that and nothing was asked for."  Park said that when he took his second car, a Mercedes, to Aboudail to have the transmission repaired, "[T]hat's when we talked about a barter agreement."  By Park's account, "I fully expected that he would ask for the payment of the transmission, but that he would do the labor."  Park testified that "[t]here was no agreement between Mr. Aboudail and I on fixing the Mercedes or any part of [the] firewall," that they never really reached an agreement on how much it was going to cost to build the firewall, that they never reached an agreement on how much Park was going to pay

3

Aboudail for the work on the Mercedes, and that they never agreed to an exact amount for a second construction project in Benbrook.

## B. Car Repairs

During the course of the relationship, Park brought Aboudail a total of two cars to repair. Aboudail said that he ultimately did $4,600 of automotive work for Park—$1,100 for the first car and $3,500 for the second car. While Park never brought in any other cars to be repaired, according to Aboudail, "[H]e's open to bring any car he wants, and I was willing to repair them for him."

With regard to the second car, Aboudail testified that it was a Mercedes that needed a new transmission: "I took it in, and I got transmission for it. I paid for the transmission. I put it in. The vehicle wasn't in running condition. And at the time, he didn't pick it up." According to Aboudail, Park did not pick up the Mercedes because he was behind on the payments. Also, Aboudail testified that the lender on the Mercedes contacted him twice about the vehicle. Park agreed that he not only was behind but also stopped making payments on the Mercedes. Ultimately, the debt on the Mercedes was discharged in bankruptcy. At the time of trial, Aboudail was still in possession of Park's Mercedes, although he was willing to return it to Park. However, because Aboudail had possessed the Mercedes since approximately 2011, Park believed that he was entitled to a "thousand bucks a year" in recovery for loss of use of the vehicle.

## C. Construction Work

Park obtained the permit for the construction work relating to the firewall,[2] which was paid for by Aboudail, and started work on the project. Aboudail maintained that Park never finished the work on the firewall, and he had to hire somebody else, at the cost of $2,200, to finish the work. Park agreed that he did not finish the firewall project "[b]ecause [Aboudail] didn't live up to his end of the agreement and get us paid."

Park also did work on a construction project at one of Aboudail's rent houses in Benbrook. While there was no specific agreement about an amount to be paid for the work, Park testified that he expected to be paid a "reasonable amount." Park stated that he completed the work on the Benbrook rental property, and "as far as [he] knew," Aboudail was satisfied with the work. At the conclusion of that work, Aboudail said that "I did pay him what he asked for," which he believed "was, like, $2,300, something." According to Aboudail, he paid Park in cash and did not keep any records of the payments made to Park "because basically, we were working as friends so I did not -- just his word and my word." Park acknowledged that he received a cash payment from Aboudail "in the neighborhood of $2,000."

---

[2]While the initial conversation between Aboudail and Park involved work on a firewall and carport at the automotive repair business, Park never did build a carport.

## D.  Invoices

Aboudail contended that he never received an invoice for work on the firewall or Benbrook house until after the lawsuit was filed.  Park, however, stated that he gave an invoice for his work to Aboudail.  While the invoice was dated June 27, 2012, Park testified that it was given to Aboudail six months prior to that date.[3]  Aboudail denied receiving invoices from Park and "never promised to pay him anything." While he said that he "gave a receipt [to Aboudail] when I received the money," Park had no proof of the receipts in his possession.  At trial, Park introduced a "statement" showing that a total of $30,834.46 was owed to him.  Aboudail contended that the documents and invoices that Park was relying on at trial were "fraudulent."

## E.  The Claims in the Lawsuit

Park sued Aboudail, asserting claims for a sworn account, oral contract, and quantum meruit, and damages for loss of use of his vehicle.  In his pleadings, Park alleged that he "provided services" to Aboudail "in three separate matters" and that he was owed $19,610.13 for work done on the Benbrook residence, $25,620.54 for construction services to build a firewall, and $6,269.84 for services to obtain a permit to build the firewall.

---

[3]Park explained the discrepancy as follows: "This is not the exact original invoice, but just like any other business, there's a dating thing that happens.  So as you go through and reconcile your accounts, this is based on the dating of the accounts."

Aboudail answered with a general denial, verified denials, and counterclaims for fraud and breach of contract. In the fraud counterclaim, Aboudail contended that Park committed fraud "in filing exhibits entitled 'Invoices' which were created after the litigation was filed and were never presented to" Aboudail prior to suit being filed. In the breach of contract counterclaim, Aboudail alleged that Park had agreed but failed to pay him for "the amount of the parts necessary to fix counterdefendant's vehicle." Finally, Aboudail asserted that Park's suit was barred by estoppel, laches, release, and waiver.

## F. The Trial Court's Rulings

After Park rested at trial, Aboudail's attorney moved for directed verdict on the sworn account and quantum meruit causes of action. The trial court granted the directed verdict on the sworn account,[4] but denied it on "the other causes of action." After further discussion with the attorneys, the court requested briefing on the quantum meruit part of the motion. Ultimately, the court entered a "Take Nothing Judgment as to all Claims and Counterclaims" on May 21, 2020.

On June 22, 2020, Park filed a motion to extend the deadlines under Texas Rule of Civil Procedure 306a. Tex. R. Civ. P. 306a. In it, he contended that his counsel "did not receive a notice of the judgment by first class mail as required by Rule 306a, and had no actual knowledge of the judgment having been signed until he

---

[4]In his reply brief, Park states that he "abandoned that theory of recovery, so directed verdict on that issue was proper."

7

went to the courthouse and obtained a copy of the judgment on June 18, 2020." Park acknowledged that the judgment was emailed to counsel, but he alleged that Park's counsel "did not see it, read the email, or become aware of its contents" prior to June 18, 2020. The motion was denied by order signed July 23, 2020. No findings of fact or conclusions of law were entered. This appeal by Park followed.

## III. DISCUSSION

### A. Sufficiency of the Evidence

In his first issue, Park contends that the trial court erred in granting a take-nothing judgment against him because it "was against the great weight and preponderance of the evidence." A party must demonstrate on appeal that an adverse finding is against the great weight and preponderance of the evidence when he attacks the factual sufficiency[5] of an adverse finding on an issue on which he has the burden of proof. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). Park's factual insufficiency point is premised on his claims for quantum meruit and for loss of use of his vehicle.

---

[5]In his reply brief, Park contends that the evidence was "legally and factually insufficient." However, a reply brief may not be used to raise issues not asserted in a party's brief on the merits. *Rollins v. Denton Cty.*, No. 02-14-00312-CV, 2015 WL 7817357, at *2 n.6 (Tex. App.—Fort Worth Dec. 3, 2015, no pet.) (mem. op.). "It is axiomatic that an appellate court cannot reverse a trial court's judgment absent properly assigned error." *Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998) (per curiam). Thus, we will not address Park's legal sufficiency argument raised in his reply brief.

## 1. Standard of Review

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). We examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, the party must demonstrate on appeal that the adverse finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co.,* 46 S.W.3d at 242.

In a trial to the court in which no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). When a reporter's record is filed, these implied findings are not conclusive, and an appellant may challenge them by raising issues challenging the legal and factual sufficiency of the evidence to support the judgment. *Id.* We apply the same standard when reviewing the sufficiency of the evidence to support implied findings that we use to review the

9

evidentiary sufficiency of jury findings or a trial court's express findings of fact. *Id.*; *Liberty Mut. Ins. Co. v. Burk*, 295 S.W.3d 771, 777 (Tex. App.—Fort Worth 2009, no pet.). We must affirm the judgment if we can uphold it on any legal theory supported by the record. *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766–67 (Tex. 2011); *Liberty Mut. Ins. Co.*, 295 S.W.3d at 777.

### 2. Analysis

In his brief, citing minimal authority, Park claims that it is "undisputed that valuable services were provided, and that Aboudail refused to pay." Therefore, "Park earned the money he billed to Aboudail," and should recover. Aboudail responds,

> After tenuously citing a singular case[6] setting forth the standard of review concerning sufficiency of evidence, [Park] fails to apply any of the facts in this case to the citation but instead invites us to apply common sense to the narrowly tailored scenario and proceeds to cobble together a series of suppositions irrelevant to the issue(s) at hand and leaves us simply with "This is unjust enrichment if there ever was such a thing."

We agree.

As the plaintiff, Park bore the burden to prove all elements of his claim for quantum meruit. To recover under his quantum-meruit theory, Park had to prove that: (1) valuable services were rendered or materials furnished; (2) for the person

---

[6]Failure to cite applicable authority or provide substantive analysis waives the issue on appeal. *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.). Despite the lack of authority or analysis, we will address the issues as we discern them from the arguments. *See Golfis v. Houllion*, No. 05-15-00036-CV, 2016 WL 6236842, at *2 (Tex. App.—Dallas Oct. 25, 2016, no. pet.) (mem. op.); *see also* Tex. R. App. P. 47.1.

sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged. *See Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). Quantum meruit is an equitable theory of recovery which is based on an implied agreement to pay for benefits received. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

With regard to the fourth element, not only must the plaintiff expect to be paid for the services but also there must be proof that the recipient of the services had reasonable notice that the plaintiff, in performing the services, expected to be paid by the recipient. *Collins & Aikman Floorcoverings, Inc. v. Thomason*, 256 S.W.3d 402, 408 (Tex. App.—San Antonio 2008, pet. denied). The notice element focuses on what Aboudail, not Park, knew or should have known at the time that Aboudail accepted the services. *See Tricon Tool & Supply, Inc. v. Thumann*, 226 S.W.3d 494, 504 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

Here, there is some evidence to support Aboudail's contention that Park did not expect to be paid at the time of his services and that Park did not notify Aboudail of his expectation of payment. Specifically, Aboudail stated that theirs was a "service for service" or bartering agreement, and he denied that he had notice that Park ever expected to be paid for his services. Aboudail opined that theirs was a "friendly

11

agreement" where neither charged for the labor they did for the other. According to Aboudail, he "never promised to pay [Park] anything." Park admitted that there was no agreement reached regarding payment for either the car repair or construction work. And although Park said that he gave an invoice for his work to Aboudail, Aboudail denied receiving the invoices until after litigation ensued.

While Park testified that the agreement was different and that he should be paid a reasonable amount, the trial court could have disbelieved his version of events. In a bench trial, the trial judge, as the trier of fact, assigns the weight to be given testimony, and resolves any conflicts or inconsistencies in the testimony. *Young v. Young*, 168 S.W.3d 276, 281 (Tex. App.—Dallas 2005, no pet.). Because the testimony is conflicting, the trial court was free to resolve those conflicts and conclude that Park failed to prove the elements of his quantum meruit claim. *See id.*

With regard to the claim for loss of use of the Mercedes, Aboudail alleged that Park intentionally left the Mercedes in his shop to avoid repossession. Asserting the defense of waiver, Aboudail also contended that Park should not recover for loss of use of the vehicle "when he flat refused to pick up the vehicle." Waiver is defined as "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Sun Expl. & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987). Because waiver is largely a matter of intent and is ordinarily a question of fact, the trial court as the trier of fact could have found that, consistent with Aboudail's assertions, Park chose not to pick up the vehicle to avoid its repossession and,

12

therefore, waived his right to recover for his loss of its use. *See Motor Vehicle Bd. of Tex. Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n*, 1 S.W.3d 108, 111 (Tex. 1999) (per curiam).

On this record, and in the absence of specific findings of fact and conclusions of law, we cannot say that the trial court's take-nothing judgment is so contrary to the overwhelming weight and preponderance of the evidence that it is clearly wrong and unjust. *See Pool*, 715 S.W.2d at 635. Therefore, Park's first issue is overruled.

## B. Extension of Deadlines Under Rule 306a

In his second issue, Park contends that the trial court erred in denying relief pursuant to Texas Rule of Civil Procedure 306a because "[t]he purpose of that motion was to permit the timely filing of a request for findings of fact and conclusions of law." Park states that no testimony was taken at the hearing on his motion to extend deadlines under Rule 306a, that the "court's decision was apparently based on an email that had been sent out concerning the judgment," and that "the court's denial of the motion was in violation of the letter and the spirit of Rule 306a." Aboudail responds that Park had actual knowledge of the judgment on June 18, 2020, and "[s]everal notifications prior to this were sent via electronic mail." Neither Park nor Aboudail cite any authority in support of their arguments other than Texas Rule of Civil Procedure 306a. *See* Tex. R. Civ. P. 306a; Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

13

Texas Rule of Civil Procedure 306a, entitled "Periods to Run from Signing of Judgment," provides a procedure to modify the postjudgment timetables so that the time begins on the date that the party or the party's counsel first received notice or acquired actual knowledge of the signing of the judgment. *See* Tex. R. Civ. P. 306a(4), (5); *Jarrell v. Bergdorf*, 580 S.W.3d 463, 467 (Tex. App.—Houston [14th Dist.] 2019, no pet.). A properly filed and granted motion under Rule 306a(5) "restarts the postjudgment timetable." *Moore Landrey, L.L.P. v. Hirsch & Westheimer, P.C.*, 126 S.W.3d 536, 541 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (emphasis omitted). If one affected by a judgment neither receives notice nor acquires actual knowledge of it within twenty days of the date it was signed, then periods commencing on the signing of the judgment begin upon the date the affected party received notice or acquired actual knowledge of the signing. Tex. R. App. P. 4.2(a)(1).

To take advantage of the extended time period provided in Rule 306a(4), the party adversely affected is required to prove in the trial court, on sworn motion and notice, the date upon which the party or the party's attorney first either received notice of the judgment or acquired actual knowledge of its signing, and that this date was more than twenty days after the date the judgment was signed. *Moore Landrey*, 126 S.W.3d at 541. In addition, Texas Rule of Appellate Procedure 4.2(c) states that after a hearing on a Rule 306a motion, "the trial court must sign a written order that finds the date when the party or the party's attorney first either received notice or acquired actual knowledge that the judgment or order was signed." Tex. R. App. P.

4.2(c). The appellant must obtain a finding from the trial court, not the appellate court, establishing that such notice or knowledge was received more than twenty days after the date the judgment was signed. *McDowell v. Walt*, No. 07-03-0188-CV, 2003 WL 21197313, at *1 (Tex. App.—Amarillo May 21, 2003, no pet.) (mem. op.) (per curiam). Without it, the affected party cannot invoke the benefits of Rule 4.2(a)(1). *Id.*

In his motion, Park sought relief under Rule 306a and alleged that his counsel did not receive timely notice of the judgment or acquire actual knowledge of the judgment until June 18, 2020. While he acknowledges that a "notation on the judgment indicates that it was emailed to counsel," Park's counsel states that he "did not see it, read the email or become aware of its contents." Indeed, the clerk's record indicates that on May 22, 2020, notice of the judgment was "electronically served to Party's attorney and/or mailed to all pro-se parties." *Compare* Tex. R. Civ. P. 21(f)(10) ("The clerk may send notices, orders, or other communications about the case to the party electronically.") *with* Tex. R. Civ. P. 306a(3) ("When the final judgment or other appealable order is signed, the clerk of the court shall immediately give notice to the parties or their attorneys of record by first-class mail advising that the judgment or order is signed."). In addition, the clerk's record contains a document entitled "Notice of Final Judgment or Other Appealable Order" which states, "In accordance with Texas Rules of Civil Procedure 306a, notice is hereby given that a(n) Final Judgments After Non-Jury Trial was signed on May 21, 2020." While Park's attorney

15

attested that he "did not receive a first class letter informing me that a judgment had been signed in this case," he did not dispute receipt of the electronic notice.

The trial court's docket entry indicates that a hearing on the motion to extend was held on July 23, 2020, that "[a]ll parties appeared via Zoom and made arguments," and that the court denied the motion and signed an order. When a trial court does not make findings on the Rule 306a motion, as here, we will infer necessary findings in favor of the trial court's judgment unless the record contains no evidence to support the finding or conclusive evidence negating the finding. *United Residential Props., L.P. v. Theis*, 378 S.W.3d 552, 558 (Tex. App.—Houston [14 Dist.] 2012, no pet.). Park has not provided a record from the hearing and has not obtained the trial court order and finding required by Texas Rule of Appellate Procedure 4.2(c). Without that order and finding, the motion to extend does not establish the date upon which Park or his counsel first either received notice of the judgment or acquired actual knowledge of its signing. Further, he has failed to negate that he timely received, yet failed to read, notice of the judgment by email. Therefore, Park cannot show that the trial court erred in denying his motion under Rule 306a(5). *See* Tex. R. Civ. P. 306a(5); *Jarrell*, 580 S.W.3d at 468. We overrule Park's second issue.

## IV. CONCLUSION

Having overruled both of Park's issues, we affirm the trial court's judgment.

16

/s/ Dana Womack

Dana Womack
Justice

Delivered:  April 15, 2021